[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 19, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-13365

_____

D. C. Docket No. 05-00192-CV-OC-10GRJ

TOMMY E. HOLLY,
an individual,

Plaintiff-Appellant,

versus

CLAIRSON INDUSTRIES, L.L.C.,
a Florida Limited Liability,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(July 19, 2007)**

Before ANDERSON, MARCUS and HILL, Circuit Judges.

MARCUS, Circuit Judge:

The plaintiff, Tommy Holly ("Holly"), appeals from the district court's grant

of final summary judgment in favor of his former employer, defendant Clairson Industries ("Clairson"), on Holly's claims that Clairson failed to reasonably accommodate his disability, in violation of Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12111-12117 ("ADA"), and its Florida analog, the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01 ("FCRA"). After seventeen years of strong work performance during which Clairson informally accommodated Holly's disability-related tardiness, Clairson terminated Holly, pursuant to its new, no-fault punctuality policy. The district court granted summary judgment to Clairson after finding that strict punctuality, as defined by Clairson's new policy, was an "essential function" of Holly's job within the meaning of the statutes, and that Holly was incapable of performing that function "with or without a reasonable accommodation." The district court further held, in the alternative, that Holly was not the victim of unlawful discrimination because he had offered no evidence that Clairson had treated him differently from similarly-situated, non-disabled employees.

After thorough review of this record, we conclude that genuine issues of material fact exist concerning whether strict punctuality was an "essential function" of Holly's position. Accordingly, the entry of summary judgment for Clairson on this issue was improper. Moreover, it was error for the district court to

2

have held, in the alternative, that Holly is required to present evidence that his employer treated him differently than his non-disabled co-workers. Under the plain language of the ADA and the FCRA, an employer's failure to reasonably accommodate an "otherwise qualified" disabled employee itself constitutes unlawful discrimination, unless the employer can show "undue hardship." Accordingly, we reverse and remand for further proceedings consistent with this opinion.

## I. **Background**

The relevant facts in this summary judgment record, which we take in the light most favorable to Holly as the non-movant, see Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000) (per curiam), are these. Holly became a paraplegic in 1984, at the age of about 20, as a result of a motorcycle accident. Since then, Holly has been confined to a wheelchair for the majority of each day, although he is able to drive an automobile. Clairson hired Holly in 1986, shortly after Clairson's opening. Clairson is a custom plastic injections molder that manufactures, using an assembly line, industrial and medical devices such as disposable surgical tools. Holly was hired for the position of mold polisher, where for many years he worked in the tool room polishing molds after they came off the assembly line. Holly's shift ran from 7:00 am to 3:00 pm, although he normally

3

worked more than forty, and sometimes as many as sixty, hours per week.

Although Holly has never had an attendance problem, he acknowledges that from the beginning of his employment at Clairson, his disability frequently caused him to arrive late to work.[1] Clairson employees' punctuality is recorded when they "punch in" for work on a time clock located in the break room. Employees access the break room in one of two ways: utilizing either an internal entrance from the main area of the warehouse into the break room or an external entrance from the parking lot into the break room. To avoid overtime charges, employees are not permitted to clock in prior to five minutes before the start of their shift.[2] Thus, Holly was required to clock in between 6:55 and 7:00 a.m. in order to be on time.

For the first fifteen years or so of Holly's employment with Clairson, absenteeism and tardiness were primarily addressed at an employee's annual review, where supervisors had some discretion over whether to alter their recommendations for retention and salary raises based on an employee's tardiness. Mold polishers are directly supervised by the Mold Shop Manager. Thus, Holly

---

[1] Holly testified that his disability was the direct cause of approximately 95% of the occasions on which he was late to work; the remaining 5%, he said, was due to weather or vehicle difficulties. Holly also testified that he had no attendance or punctuality problems during more than four years prior to his accident when he worked at a large grocery store chain stocking shelves.

[2] The testimony of Dennis Miller, Holly's supervisor during his last seven or so years at Clairson, suggests that employees may have had seven minutes before the start of their shift in which to clock in. See infra note 5.

4

addressed the tardiness problems caused by his disability by discussing them with the Mold Shop Manager. The Mold Shop Manager from 1988 to 1996, Steve Nilson ("Nilson"), and the Mold Shop Manager from 1999 to 2004, Dennis Miller ("Miller"), collectively served as Holly's immediate supervisor for some thirteen of Holly's seventeen years with Clairson. Each gave deposition testimony in this case. According to Miller, under this "flexible" policy, "[i]f the H[uman] R[esources] people would approach me and say that a man had been tardy or late or absent or whatever, I had the authority to tell them that it was okay by me for whatever reason."

Holly testified, and the record reflects, that when he was late to work, it was usually only by a minute or so. Both Miller and Nilson testified that on these occasions -- which they agreed accounted for the vast majority of his tardies -- they did not notice that Holly was late, and only learned of these tardies from Human Resources prior to an annual review. Holly gave various disability-related reasons for being a minute or so late. "Occasionally," he said, one of several picnic tables in the break room had been moved in front of the time clock, blocking his access to the clock from his wheelchair. Although Clairson normally moved such tables as soon as Holly asked them to do so, Holly's supervisor from 1996 to 1999, Greg Huff, noted on some of his annual reviews that some of the tardies

5

recorded there were due to occasions when the time clock had been blocked by a table. Miller similarly confirmed that "[t]he break area where the time clock was situated was extremely small. And due to the number of employees that the company had, they had to have a lot of tables in the breakroom to accommodate the people during their breaks and the time clock was back behind the tables. So when [Holly] came into the break area, he had to weave his way through the tables to get back to the clock. And it was like that up to, probably, six months before I left" in May of 2004.[3]

Holly testified that at other times, pallets of raw materials blocked the interior or exterior entrance to the break room. Because Clairson was short on storage space, he explained, it tended to store both raw materials and finished product in any dry place it could find. Holly testified that Miller often fought with Archie Mann, the person in charge of the production area in the warehouse, about the fact that "hallways, entrances, [the] tool room and occasionally the breakroom" were blocked, but that Mann would respond that he had nowhere else to place the materials, and that "more than once" Miller unblocked these places himself. Miller

_____

[3] In early 2004, Clairson acquired a new time clock that used employees' hand prints to clock them in. At first, Clairson installed this device too high for Holly to reach from his seated position in his wheelchair. At Holly's request, Clairson reinstalled the clock at a lower level. It appears from the record that this additional problem was a one-time occurrence that could not have caused Holly to clock in late more than once, at most.

confirmed that Holly had complained to him "on several occasions" about various blockages and that Miller had discussed the problem with Mann, who had suggested that Holly simply arrive to work "ten or fifteen minutes earlier" to "move around our obstacles."[4] Holly estimated that these blockages caused him to be late four or five times after the new policy went into affect.

Holly also said that "occasionally" he was unable to clock in on time because he was in a long line of fellow employees also trying to clock in.[5] In addition, although every employee encounters the occasional car problem, he said that some types of car problems would be particularly difficult for him to fix, given his disability. Similarly, if it were raining heavily when he arrived at work, he

[4] The district court, apparently referring to this incident, stated that "[i]n addition" to Clairson's accommodating Holly by moving tables blocking the time clock and lowering the time clock itself, "there is evidence in the record that Holly was told to simply arrive to work ten minutes earlier each day . . . ." Order at 21 n.47. Even assuming that this would have constituted a reasonable accommodation from Holly's perspective, as we read the record, Mann made this suggestion to Miller, and there is no evidence that Miller ever communicated it to Holly.

[5] Holly testified that "anywhere from thirty to forty" coworkers might be in line waiting to clock in with him. Miller likewise testified that "thirty-five to forty people [would be] trying to get into that time clock in a seven minute span. And Tommy being in a wheelchair, was always at the end." Miller explained that smokers would smoke just outside the break room and wait to clock in until the last possible moment. On the other hand, Cloteen Kilkelly, who was hired as a consultant by Clairson in March of 2003 and became President of Clairson in April of 2004, only weeks before Holly was terminated, testified that "[p]ossibly" one-hundred employees worked three shifts prior to Holly's termination, and that "approximately[] twenty-one" employees shared Holly's shift. She also testified that she had never seen more than two employees in line to clock in at once, although she also testified that she did not know, and thus could not answer, whether a line forms at the time clock in the mornings. Despite this apparent factual dispute among members of Clairson's own management, the district court found that Holly worked with approximately twenty-one other employees during his shift. See Order at 7.

sometimes waited in his car for the rain to subside; he had difficulty handling his wheelchair and an umbrella at the same time, and unlike his co-workers, once he was wet he would remain wet throughout the work day, since he was unable to stand up and dry off.  Finally, Holly said that he sees a urologist three to four times per year for complications related to his disability, and that this, too, sometimes caused him to be late to work.

More rarely, Holly was noticeably late -- by thirty minutes or more.  Such lateness occurred when Holly lost bowel control while driving to work -- a consequence of his disability -- and had to return home to change before heading back to work again.  Holly did not feel comfortable discussing this problem with Nilson, but when Holly's co-worker, Miller, was promoted to Mold Shop Manager, Holly confided in Miller.[6]  According to Miller, "what I did is, I approached my boss, Steve [Nilson], at that time, and he, in turn, approached Phil Effinger, [who] was the president of the company at the time, to express that and explain that.  And that kind of helped us let some of those slide and it also helped us get him money at the end of the year when his reviews were due."

Mold Shop Managers were required to have their annual review of

---

[6] Miller replaced Nilson as Mold Shop Manager when Nilson was promoted to, first, Director of Sales, and in later succession, to Director of Engineering, Director of Sales and Engineering, and, finally, Vice President of Engineering.  At all times, however, the mold shop was under his indirect supervision.

employees approved by Effinger. Nilson testified that Holly's number of tardies would "jump out" compared to those of other mold polishers, and that Holly sometimes did not receive a raise or received a lower raise than he otherwise deserved due to his tardiness, but that Holly "was kept on because of his job performance. In the Mold Shop Department a tardiness issue did not affect how work was done, versus, as it is in production. Manufacturing is really sensitive where mold building is not." Miller, who supervised Holly in his last several years at Clairson, testified that he gave Holly a raise "[e]very time" he came up for review, observing that mold polishing "wasn't as time sensitive as other areas," so that "if somebody stayed late, as opposed to coming in early, it wouldn't really matter as long as the work was done." It is undisputed that Holly did indeed get his work done in a timely fashion by working through breaks or after his shift to make up for any time he lost at the beginning of his shift.

Clairson concedes that Holly had a good attendance (as opposed to a punctuality) record, and that "[o]ther than Holly's [tardiness] problems, he was a good employee." In fact, Clairson approved numerous and regular merit raises for Holly throughout his seventeen-year tenure at Clairson[7]; Holly received his last

---

[7] The record reflects that Holly received raises on at least the following occasions. There is no record evidence regarding Holly's hourly rate of pay from the date he began working for Clairson, on November 3, 1986, until May 1, 1989. On that date, Holly received a raise from $5.85 to $6.25 per hour. On November 3, 1989, Holly received a raise to $6.75 per hour. On

merit raise in February of 2004, just weeks before he was terminated on May 3 of that year.[8]  In fact, both of Holly's supervisors testified that he was <u>very</u> good at his job.  Miller said Holly "was always a good worker. . . . He was extremely talented.  Extremely organized, very neat, orderly, very meticulous about the stuff that he did."  Miller testified that he regularly recommended raises for Holly based on Holly's "ability to perform his job, the quality of his workmanship, his dependability.  Tommy was one of those fellas that may come in a minute or two late in the morning, but he would make it up.  Whether he would stay over in the evening, work through a break, work through a lunch hour, work through whatever to help the company get the job done."  Nilson similarly testified that "[f]rom a job performance standpoint, [Holly] did his job very well."

Holly's performance evaluations by all four Mold Shop Managers who supervised Holly during his seventeen years at Clairson support this testimony.

---

May 30, 1990, Holly received a raise to $7.10 per hour.  On November 3, 1990, he received a raise to $8.00 per hour.  There is no information on Holly's rate of pay between November 3, 1990 and November 5, 1996, but by the latter date, Holly was earning $11.00 per hour and on that date received a raise to $11.25 per hour.  On November 3, 1997, Holly received a raise to $12.25 per hour.  On November 3, 1998, Holly received a raise to $12.75 per hour.  On November 2, 1999, Holly received a raise to $13.75 per hour.  On November 6, 2000, Holly received a raise to $14.25 per hour.  There is no information on Holly's rate of pay between November 6, 2000 and February 2004, when he received a raise of thirty-eight cents.

[8] Cloteen Kilkelly, who was at the time of Holly's last raise Executive Vice President of Clairson, and who would become President two months later in April of 2004, testified that she could not explain why Holly had received a raise when he was proving incapable of performing what Clairson alleges is an essential function of Holly's job, although Kilkelly conceded that she had "signed off"on that raise.

They consistently gave Holly good-to-excellent reviews, and described him as a "very dependable" and "reliable" employee who "always hangs in there when [needed]," and as "a real asset to our shop." Holly's supervisors also praised him for his "excellent" productivity and initiative, for his "very good work," and for "always help[ing] out when polishing is scarce." Once, Holly was named Employee of the Month.

In March of 2003, Clairson hired Cloteen Kilkelly ("Kilkelly"), an employee benefits specialist, to advise Clairson on how to make some changes in that area. (In November of 2003, Kilkelly became Executive Vice President and then, in April of 2004, President.) On June 15, 2003, on Kilkelly's recommendation, Clairson instituted a new, "no-fault" Attendance Policy. Under the policy, each absence from work counts as one "occurrence," while each partial absence -- or tardy -- counts as a one-half occurrence. An employee who clocks in even one second past his shift start time receives a one-half occurrence. The policy provides for a progressive series of verbal and written warnings as an employee accrues more occurrences, and provides for immediate termination upon the accrual of eighteen tardies (or nine occurrences) within one year.[9]

---

[9] The policy also has a reduction provision: for each 90-day period in which the employee has no occurrences, Clairson will remove one occurrence from his record. In addition, each occurrence is removed one year from the date on which it accrues.

11

As the company's Employee Manual explains, the policy employs a "No-Fault Standard":

> Under the no-fault approach, there are no excused or unexcused absences. Employees need not prove the legitimacy of an absence, nor are managers/supervisors forced to differentiate between acceptable and unacceptable reasons for an absence.

> Under a "no-fault" system, there is no need for a written physician's excuse. Physician's statements will be required to support a request for a medical leave. Medical leaves are granted for periods of five (5) days or more.

Thus, as Kilkelly testified, tardy employees may not make up lost time during breaks or after their shift. Nor may they plan to be excusably tardy for any reason, including to see a doctor (unless their medical condition results in their missing five or more consecutive days of work). Even paid vacation counts toward an employee's "occurrence" allotment. Moreover, the Employee Manual states that "[a]ttendance is an essential job function for all at the Company. Employees with American Disability Act [sic] situations are not exempt from this policy."

The Employee Manual explains its rationale this way. As for the "Attendance Policy" in general, the handbook says:

> Each employee is expected to work the hours normally scheduled for his or her position. When employees fail to take attendance seriously, time consuming rearrangements and costly replacements are often necessary to maintain our business activity. Each employee is therefore responsible for reporting to work regularly and on time. . . .

12

With respect to "Partial Absences/Tardiness" in particular, the handbook explains:

> Tardy employees may delay assembly operations and force other employees to stand idle as the supervisor waits for unpunctual employees to report to work or until temporary replacements can be oriented and placed on the job. . . .

Kilkelly testified that the purpose of the no-fault standard was to "take[] the subjectivity somewhat out of people being treated differently by different supervisors" and "to address the chronic offender." She confirmed that under this standard, there are no acceptable reasons for being tardy.

Miller testified that once Holly learned of the new policy, Holly approached Miller, then his immediate supervisor, and "said to me that you know, 'It's going to be extremely difficult for me to do this with my problems that I have.'" Holly further said that Miller told him on at least one occasion that he "would go to the front office and talk to them [o]n my behalf." The record is unclear as to how <u>far</u> up Clairson's management chain Holly's expressed concern went after this. Miller added that instead of approaching Kilkelly, he approached Nilson. Miller explained that Kilkelly

> was kind of a hands-off person to me to supervisors [sic]. She liked dealing with her managers, which Steven Nilson was my immediate manager. And Steve and I talked all the time about different procedures and policies and what we could do. And Steven and myself knew that a minute or two late was not hurting the company. We knew it was being made up. We knew that the guys were trying very hard for whatever reason. But whether he carried that on to Ms.

13

Kilkelly, I can't answer that.

Miller also said that he expressed to Nilson his concerns that under the new policy employees with medical problems would be disadvantaged:

> I will give you an example. We had some fellows that are diabetics that have to take certain blood tests which ha[ve] to be performed at seven a.m. in the morning . . . . four times a year. . . . So every time they did that, they got . . . half an occurrence . . . . And I expressed my concern to him about, "You have a model employee here that works fifty-five, sixty hours a week, Saturdays, Sundays, whatever, and we can't make an accommodation for a fellow that actually has a doctor's appointment?"
>
> . . . I told [Nilson] I thought it was unfair. . . . The men that worked the day shift have to go to the doctor. The women have to go to the doctor. There has to be some type of exceptions made where the policy is flexible enough to allow you to do that. And this was so ironclad, and Steven Nilson agreed with me. But he said it's been the directive from HR and that's the way it's going to be.

Nilson, in turn, who was at the time a vice president of the company, testified that only Clairson's president, Kilkelly, had the authority to veto a termination, and that with respect to Holly, he "had gone to HR trying to reverse occurrences, because it's very difficult to replace an employee of that talent. And I was told that the system is in place for a reason, and no exceptions can be made." Nilson said he argued to Human Resources, "I need this employee in my department, it's extremely hard to replace a mold polisher and because our department is not as attendant [sic] sensitive as other departments in the company,

14

I wanted to retain him." However, Holly's disability apparently did not specifically enter into Nilson's conversation with Human Resources about retaining Holly.

On October 1, 2003, Holly received a verbal warning, pursuant to the policy, after being late eight times, for a total of four occurrences. On February 12, 2004, after being late three more times and accumulating a total of 5.5 occurrences, he received a second verbal warning. On March 23, 2004, Holly received a written warning after he was late one more time and reached six occurrences. On April 14, 2004, he received a second written warning after he was late two more times, for a total of seven occurrences. On May 3, 2004, after Holly was late four more times and reached nine occurrences, Holly was automatically terminated. According to Clairson's records, Holly had been late a total of one hour and thirteen minutes over eighteen episodes. On twelve of those occasions, Holly was tardy by only one minute. He was also late by five minutes on two occasions, by six minutes once, and by fifty-three minutes once.[10] According to Nilson, after Holly's termination, the mold shop was downsized by about 50%, or by about 14 employees, due to

_____

[10] Holly was late by one minute on the following eight dates in 2003 -- June 26, July 7, July 10, July 17, July 22, August 25, September 15, September 23 -- and on the following four dates in 2004 -- April 9, April 22, April 23, and April 28. Holly was late by five minutes on March 11, 2004, and on April 27, 2004, and he was late by six minutes on April 13, 2004. Holly was late by fifty-three minutes on February 16, 2004. Clairson's records indicate the extent of Holly's tardiness on only sixteen of the eighteen occasions.

15

lack of sales.  Clairson has not refilled Holly's position.

After receiving a Notice of Right to Sue from the Equal Employment Opportunity Commission ("EEOC"), Holly commenced this lawsuit against Clairson in the Circuit Court of the Fifth Judicial Circuit, in and for Marion County, Florida, for failure to reasonably accommodate his disability, leading to his termination, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 ("ADA"), and its Florida analog, the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01 ("FCRA").[11]  Clairson removed the case to the United States District Court for the Middle District of Florida, and responded that Holly's failure-to-accommodate claims must fail because he is not a "qualified individual" within the meaning of the ADA and the FCRA -- that is, one who, with or without a reasonable accommodation, can perform the essential functions of his position.  Clairson argued that strict punctuality, pursuant to its new attendance policy, is an "essential function" of Holly's job that he cannot perform with or without an accommodation, and that, in any case, Holly never requested an accommodation, and therefore Clairson's obligation to provide one was never triggered.

---

[11] Holly also brought a claim against Clairson for intentional infliction of emotional distress, in violation of Florida common law.  The district court granted summary judgment to Clairson on this claim, too, but Holly has not appealed from that decision.

The district court granted final summary judgment to Clairson on both of Holly's claims. The court determined that strict punctuality, as defined by Clairson's policy, was an essential function of Holly's position, and that no reasonable accommodation would enable him to perform that function. The district court also sua sponte held, in the alternative, that Holly's claims failed because he did not provide any evidence that Clairson treated him differently from non-disabled employees. Holly timely appealed.

## II. Discussion

As the district court correctly observed, disability-discrimination claims under the FCRA are analyzed using the same framework as ADA claims. See D'Angelo v. Conagra Foods, Inc., 422 F.3d 1220, 1224 n.2 (11th Cir. 2005). We therefore consider both claims together. See id.

We review de novo a grant of summary judgment on ADA claims, construing the facts in the light most favorable to the non-moving party. Lowe v. Ala. Power Co., 244 F.3d 1305, 1307 (11th Cir. 2001). "Summary judgment is proper if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Id.

Under the controlling law in this Circuit, "[t]he burden-shifting analysis of

17

Title VII employment discrimination claims is applicable to ADA claims." Earl,
207 F.3d at 1365. To establish a prima facie case of discrimination under the
ADA, a plaintiff must show: (1) he is disabled; (2) he is a qualified individual; and
(3) he was subjected to unlawful discrimination because of his disability. Id. It is
undisputed that Holly is disabled within the meaning of the ADA. The other two
prongs, however, are contested in this appeal.

### A. Prong Two: "Qualified Individual"

In order to make out the second prong of his prima facie case, Holly must
prove that he is a "qualified individual" -- that is, someone with a disability who,
"with or without reasonable accommodation, can perform the essential functions of
the employment position that such individual holds or desires." 42 U.S.C. §
12111(8); see also Earl, 207 F.3d at 1365. "Accordingly, an ADA plaintiff must
show either that he can perform the essential functions of his job without
accommodation, or, failing that, . . . that he can perform the essential functions of
his job with a reasonable accommodation." D'Angelo, 422 F.3d at 1229 (quotation
marks omitted). An accommodation is "reasonable" and necessary under the
ADA, in turn, only if it enables the employee to perform the essential functions of
the job. Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1259-60 (11th Cir. 2001);
LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 835 (11th Cir. 1998); see

18

also 29 C.F.R. § 1630.2(o)(1)(ii) ("The term reasonable accommodation means: . . . Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position . . . ." (emphasis added)). "If the individual is unable to perform an essential function of his job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA. In other words, the ADA does not require the employer to eliminate an essential function of the plaintiff's job." D'Angelo, 422 F.3d at 1229 (quotation marks and alterations omitted). On the other hand, "the ADA may require an employer to restructure a particular job by altering or eliminating some of its marginal functions." Lucas, 257 F.3d at 1260 (emphasis added).

Holly argues that Clairson failed to accommodate his disability by not allowing him to occasionally clock in to work late and make up any lost time during breaks or overtime, as he had been allowed to do for fifteen years prior to the implementation of the new policy. Clairson responds that strict punctuality, as defined by its policy, is an essential function of Holly's position as mold polisher, and that as such, it is not required to eliminate this critical function. Assuming arguendo that this is true (and we return to this central question below), it is clear

19

from the fact that Holly violated Clairson's punctuality policy on several occasions, and indeed by Holly's own admission, that his disability prevents him from performing this function without an accommodation. It is also clear that permitting Holly to occasionally clock in late and make up lost time over breaks and after hours would not allow him to perform the function of strict punctuality, as defined by Clairson's policy, according to which tardiness by mere seconds constitutes an infraction which cannot be made up, regardless of the cause of the tardiness. Thus, assuming that strict punctuality, as defined by Clairson's no-fault policy, is an essential function of Holly's position, the accommodation Holly suggests would "require [Clairson] to eliminate an essential function of [Holly's] job," something the ADA does not require Clairson to do. We therefore agree with the district court that if strict punctuality is indeed an essential function of Holly's position as a mold polisher, then he cannot perform this function "with or without reasonable accommodation," he is therefore not a "qualified individual" under the ADA, and his claims ultimately must fail.

However, Holly argues that strict punctuality -- clocking in at precisely 7 a.m. each morning -- is a marginal, not an essential, function of his position. A "reasonable accommodation" may include "parttime or modified work schedules." Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285 (11th Cir.

20

1997) (quoting 42 U.S.C. § 12111(9)(B)); EEOC, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, 2 EEOC Compl. Man. (CCH), § 902, No. 915.002 (Oct. 17, 2002) [hereinafter "EEOC Enforcement Guidance"], Question 36 ("Possible reasonable accommodations could include adjustments to starting times . . . . Example: An employee with major depression is often late for work because of medication side-effects that make him extremely groggy in the morning. His scheduled hours are 9:00 a.m. to 5:30 p.m., but he arrives at 9:00, 9:30, 10:00, or even 10:30 on any given day. . . . [I]f this individual can [perform his job responsibilities] by regularly working a schedule of 10:00 a.m. to 6:30 p.m., a reasonable accommodation would be to modify his schedule so that he is not required to report for work until 10:00 a.m."). Thus, Holly argues that rather than terminating him, Clairson could have reasonably accommodated him simply by altering this marginal function to allow him occasionally to clock in late and make up that time during breaks or after his shift ends, the very course of conduct followed by Clairson for the bulk of Holly's employment.

It is by now clear that essential functions "are the fundamental job duties of a position that an individual with a disability is actually required to perform." Earl, 207 F.3d at 1365; see also 29 C.F.R. § 1630.2(n)(2)(i). Moreover, "consideration

21

shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."  42 U.S.C. § 12111(8); see also D'Angelo, 422 F.3d at 1230.  Applying this factor to the case at hand, the district court found "ample evidence" that punctuality is an essential function of Holly's position. Order at 16.  The court cited the existence of the punctuality policy itself, Clairson's rationale for the policy, as stated in the handbook -- that tardy employees "may delay assembly operations and force other employees to stand idle," and Kilkelly's testimony that tardiness and attendance were concerns for the employer.  Id.  In relying almost exclusively on this evidence, the district court stressed that "it is within the employer's discretion to determine what job functions are essential and it is beyond dispute that Clairson made attendance and punctuality essential functions, both through its discipline of employees and clearly established policies."  Id. at 16-17.

However, when considering the employer's judgment regarding what is an essential function, we have previously considered not only the company's "official position," but also testimony from the plaintiff's supervisor.  See, e.g., D'Angelo, 422 F.3d at 1230.  Here, the two men who supervised Holly for the vast majority of

22

his many years at Clairson, including his last year or so during which the new policy was in effect, each testified that Holly's job was <u>not</u> time sensitive, and, notably, that precise punctuality didn't matter. Nilson said that "[i]n the Mold Shop Department a tardiness issue did not affect how work was done, versus, as it is in production. Manufacturing is really sensitive where mold building is not." Miller similarly testified that mold polishing "wasn't as time sensitive as other areas," so that "if somebody stayed late, as opposed to coming in early, it wouldn't really matter as long as the work was done." Thus, we think the record fairly reflects a genuine issue of material fact on this factor alone.[12]

Moreover, "[w]hether a function is essential is evaluated on a case-by-case basis by examining <u>a number of factors</u>." <u>D'Angelo</u>, 422 F.3d at 1230 (quotation

---

[12] Clairson sought leave from the district court to file out of time an exhibit of three (virtually indistinguishable) versions of the mold polisher job description, which would constitute further evidence of Clairson's judgment as to what functions of Holly's job are essential. The district court denied this motion as moot when it granted Clairson's motion for summary judgment, and the exhibit was never officially entered into the record. This has not, however, stopped either party from citing to these job descriptions in their briefs before us. Because this evidence is not part of the record below, we do not consider it here. At all events, as the parties' competing arguments suggest, the job descriptions arguably cut both ways. On one hand, as Clairson notes, one of the "general requirements" of mold polishers' job is the "ability to arrive at work in a timely manner and be at their workstation prior to the starting of their shift." On the other hand, as Holly and the EEOC point out, this factor is listed under "general requirements" and not under "essential functions," which instead include duties related to mold polishing itself. Nor is punctuality listed under "performance factors," which instead includes "dependability" -- "the manner in which you apply yourself to your work, if gets [sic] work out on time, etc." -- and "attendance" -- the "amount of time present at work." No one argues that Holly ever neglected to work at least a <u>full</u> work day, or that he ever failed to get his work out on time; in fact, his supervisors praised his job performance, and Clairson concedes that aside from punctuality, Holly was a good employee.

23

marks omitted and emphasis added); see also 29 C.F.R. § 1630.2(n)(3)(i) ("Evidence of whether a particular function is essential includes, but is not limited to: The employer's judgment as to which functions are essential . . . ." (emphasis added)). Thus, as we observed recently in D'Angelo, although "the employer's view is entitled to substantial weight in the calculus," this factor alone may not be "conclusive[]." Id. at 1233. Indeed, if it were considered to be conclusive, then an employer that did not wish to be inconvenienced by making a reasonable accommodation could, simply by asserting that the function is "essential," avoid the clear congressional mandate that employers "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

According to the EEOC's regulations implementing the ADA, other factors to be considered include: "(1) the amount of time spent on the job performing the function, (2) the consequences of not requiring the incumbent to perform the function, (3) the terms of the collective bargaining agreement, (4) the work experience of past incumbents in the job, and (5) the current work experience of

incumbents in similar jobs." D'Angelo, 422 F.3d at 1230 (quotation marks omitted) (citing 29 C.F.R. § 1630.2(n)(3)); see also Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000) (same). In addition, the EEOC regulations identify three nonexclusive bases on which a job function may be deemed essential: "(1) the reason the position exists is to perform the function; (2) there are a limited number of employees available among whom the performance of the job function can be distributed; and (3) the function is highly specialized so that the incumbent in the position was hired for his or her expertise or ability to perform the particular function." D'Angelo, 422 F.3d at 1230 (quotation marks omitted) (citing § 1630.2(n)(2)).

Several of these factors have little or no bearing on this case. The record contains no information, for instance, regarding the terms of any collective bargaining agreement, or the work experience of current and past mold polishers (other than the testimony of Miller and Nilson, both former mold polishers, that this job is not time-sensitive). A few other factors apply to some extent to the situation at hand but are not very illuminating. Thus, for instance, mold polishers spend very little time on the job performing the function of strict punctuality, the reason the position of mold polisher exists is certainly not to perform the function of being punctual, and Holly was not hired for his expertise in performing the

25

highly specialized function of punctuality. On the other hand, to the extent that strict punctuality is important, one polisher's duty to be punctual cannot be redistributed to another polisher.

Far more illuminating in this case is a consideration of the consequences of not requiring Holly to perform the function of strict punctuality. According to Clairson, these consequences would be dire. "The reason that employee tardiness is such an issue at Clairson," it says, "is that tardy employees can delay Clairson's assembly operations and force other employees to stand idle until the tardy employee's portion of the product assembly can be completed." Clairson says that this reasoning holds equally true for the position of mold polisher, and that punctuality is an essential function of Holly's position "because [Holly] is one of many employees involved in assembling products for Clairson. As Holly stated himself in his deposition, 'some jobs take 80 hours to complete and another job might take 10 minutes.' Consequently, tardiness can slow product assembly." Memo. of Law in Support of Mtn. for Sum. J. at 8; see also id. at 9 ("[Clairson's] manufacturing business requires its employees to work together to assemble products and punctuality is therefore essential."). The district court agreed, and found that "Holly worked on the assembly line, polishing the steel tooling after it was formed from the molds." Order at 2. This record, however, is not so clear.

26

As a threshold matter, the record does <u>not</u> suggest that Holly "worked on the assembly line."  To the contrary, the record indicates that the mold shop where polishers work is actually separate from the assembly line which was in a different room of the warehouse, and that Holly and others polish the molds <u>after</u> they come off of the assembly line.  Miller testified, for example, that Holly "polished the steel tooling <u>after we were finished machining it</u>" (emphasis added).  Even Kilkelly testified that as mold polisher, Holly "<u>would sit at a table</u> and the steel molds that come off of the -- <u>from another area</u>, mold maker, the steel must be polished" (emphasis added).  Nor is there any record evidence that mold polishers are required to "work together [with other employees] to assemble products."  That is, there is no evidence that other mold polishers would need to wait for Holly to arrive in order to complete their own mold polishing.  Nor is there any evidence of any post-polishing stage of manufacturing, such that employees in that department would have their work delayed by the tardiness of a mold polisher.  <u>Cf.</u> EEOC Enforcement Guidance, Question 43 ("If the result of modifying one employee's work hours . . . is to prevent other employees from doing their jobs, then the significant disruption to the operations of the employer constitutes an undue hardship.").  Instead, the best inference we can draw from this record in favor of the plaintiff -- which we must do given the procedural posture in which we review

it -- is that mold polishing, as Miller and Nilson explained, is a fairly solitary, non-time-sensitive activity.  Thus, whatever may be said of Clairson employees who work on the <u>assembly line</u>, there is precious little in this record to support the claim that a <u>mold polisher's</u> occasional tardiness -- usually by only one minute -- could "delay Clairson's assembly operations and force other employees to stand idle until [his] portion of the product assembly can be completed," or that a <u>mold polisher's</u> "tardiness can slow product assembly."[13]

The district court considered the argument that Holly's work as a mold polisher was not time sensitive, but rejected it:

> The fact that his polishing projects, by themselves, were not necessarily performed under strict deadlines does not mean that attendance and punctuality were not essential functions.  As Holly himself testified, some of his polishing jobs would take several hours, or even several days.  By not arriving to work on time, he was slowing down his production, increasing overhead, and potentially increasing overtime costs.

<u>Id.</u> at 16.  But there is no discussion whatsoever in this record of Clairson's

---

[13] There is some record evidence that as Holly's career advanced, on his own initiative and when there was no polishing to be done, he occasionally took on additional duties.  In Miller's words, Holly "actually became almost a hands-on mold maker for us.  He ran machinery just like the other fellows when there was no polishing to be done."  Nilson similarly testified that "as Tommy's career advanced, he also learned to run other equipment in the shop, so he was multitasking."  It is unclear from this testimony whether this work involved Holly being on the assembly line.  However, even assuming arguendo that it did, the record suggests that this work was both occasional and something Holly volunteered to do on his own initiative.  But this occasional assembly line work can hardly be said to be an essential function of Holly's job as mold polisher.

overhead costs under any circumstances, and we can find no record evidence to support the court's finding of increased overhead. Indeed, it is particularly difficult to imagine an actual increase in overhead costs due to Holly's tardiness since the vast majority of the time he was late by only <u>one minute</u>, and the accommodation he was permitted for some fifteen years, and which he seeks again now, involves his making up any lost time <u>the same business day</u>. Similarly, there is no record evidence that Holly was paid overtime in the past when he made up lost time during his breaks of after his shift, nor has he requested overtime pay as part of the accommodation he currently seeks.

In sum, although Clairson makes the bare assertion that strict punctuality by mold polishers is important in order to keep production moving, the record contains virtually no evidence that Holly needed to work with others to complete his work, that his tardiness ever caused production to slow down or caused any other detriment to Clairson, or that he ever failed to complete his molds on time. To the contrary, Holly's supervisors, former mold polishers themselves, testified that Holly's work was not time-sensitive, that he was able to make up his lateness the same day without impacting business, and that he was a valuable employee they fought to retain.

These factors distinguish this case from <u>Earl</u>, relied on by Clairson and the

29

district court, where we held, after considering not only the employer's "emphasis on the importance of punctuality," but also "the importance of [her] timely presence at her job" as store area coordinator, that punctuality was indeed an essential function of the plaintiff's position. 207 F.3d at 1366. Unlike Holly's position of mold polisher, the store area coordinator was shouldered with the time-sensitive duty of preparing her area of the store for customers each morning. If the plaintiff were tardy for her morning shift, then her area would not be ready for the usual influx of morning customers, and if she were tardy for a later shift, employees working the shift before hers would be forced to work overtime waiting for her to arrive. See id.

As a result, the most that can be said for Clairson's position is that a genuine dispute of material fact exists regarding whether punctuality as defined by Clairson's policy is an essential element of Holly's job, and it was thus error for the district court to have taken this issue away from the fact-finder and awarded summary judgment to Clairson.[14]

---

[14] The district court was troubled by another aspect of the second prong -- namely, whether Holly timely asked Clairson for a reasonable accommodation. The court found that Holly had not asked for an accommodation prior to litigation, and questioned whether it was appropriate to consider the accommodation Holly proposed only during litigation -- namely, "some leniency of the tardiness policy in his specific case, with of course the expectation that Mr. Holly would make up said time during either his break period or after normal work hours," see Plnff's Br. in Opp'n to Def's Mtn. for Sum. J. at 10. We have not determined whether a plaintiff must ask for an accommodation prior to litigation. See, e.g., Willis v. Conopco, Inc., 108 F.3d 282, 287 (11th Cir. 1997) (per curiam) ("Whatever may be said of [a plaintiff's]

30

B.  Prong Three: "Subjected to Unlawful Discrimination"

Although Clairson did not claim that Holly failed to make out the third

prong of his prima facie case -- that he was subjected to unlawful discrimination

because of his disability -- the district court sua sponte held, in the alternative, that

summary judgment for Clairson was warranted because "Holly has not identified a

single comparator or put forth a single shred of evidence that he was treated

differently from any non-disabled employee who violated Clairson's attendance

policy."  Order at 21-22.  The district court's implication that Holly was required to

_____

'burden' as an employee in the day-to-day workplace seeking an accommodation for her
condition, Plaintiff -- as a litigant bringing an ADA action -- has failed to produce evidence
(after the completion of discovery) of the existence of any 'accommodation' at all, 'reasonable'
or otherwise."); Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir.
1999) (per curiam) (reaffirming the rule that "the duty to provide a reasonable accommodation is
not triggered unless a specific demand for an accommodation has been made" where there was
no indication that the plaintiff had ever requested an accommodation, whether before or after the
commencement of litigation); see also Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.,
201 F.3d 894, 899 (7th Cir. 2000) (same).  Nor have we determined precisely what form the
request must take.  But the district court did not rest its grant of summary judgment for Clairson
on this ground, and we decline to resolve this fact-intensive question in the first instance on
appeal.
        There is, however, considerable irony in Clairson's complaint that Holly never requested
an accommodation when Clairson's no-fault policy specifically provides that employees "with
American Disability Act situations are not exempt from this policy," and thus that the only time
that evidence of a medical condition, such as a physician's note, is appropriate is when an
employee wishes to apply for a medical leave from work of five or more consecutive days.  We
note, also, that despite the arguable futility of doing so, Holly immediately approached his direct
supervisor upon learning of the new policy.  According to Miller, Holly "said to me that you
know, 'It's going to be extremely difficult for me to do this with my problems that I have.'"  See
 EEOC Enforcement Guidance, Question 1 ("An employee tells her supervisor, 'I'm having
trouble getting to work at my scheduled starting time because of medical treatments I'm
undergoing.'  This is a request for a reasonable accommodation."); Hendricks-Robinson v. Excel
Corp., 154 F.3d 685, 694 (7th Cir. 1998) ("A request as straightforward as asking for continued
employment is a sufficient request for accommodation.").

prove disparate treatment reflects, we believe, a misunderstanding of the fundamental nature of a reasonable accommodation claim under the ADA.[15]

Under the ADA, an employer may not discriminate against "a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees." 42 U.S.C. § 12112(a); see also Earl, 207 F.3d at 1365. "[T]he term 'discriminate' includes . . . not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business . . . ." 42 U.S.C. § 12112(b)(5)(A). Thus, an employer's failure to reasonably accommodate a disabled individual itself constitutes discrimination under the ADA, so long as that individual is "otherwise qualified," and unless the employer can show undue hardship. There is no additional burden on Holly to show that Clairson enforced its punctuality policy in a discriminatory manner by granting leniency under the policy to Holly's non-disabled co-workers while denying Holly the same leniency, nor any subsequent burdens on Clairson to show that it had "any legitimate non-discriminatory reasons for terminating Holly" or on Holly to "establish that these reasons were pretextual." Order at 22-23

---

[15] Indeed, counsel for Clairson conceded as much at oral argument.

32

n.54.[16]

Put another way, Clairson is not insulated from liability under the ADA by treating its non-disabled employees exactly the same as its disabled employees. In race and sex employment discrimination cases, discrimination is usually proved by showing that employers treat similarly situated employees differently because of their race or sex. However, the very purpose of reasonable accommodation laws is to <u>require</u> employers to treat disabled individuals differently in some circumstances -- namely, when different treatment would allow a disabled individual to perform the essential functions of his position by accommodating his disability without

---

[16] Holly argues that under <u>US Airways, Inc. v. Barnett</u>, 535 U.S. 391 (2002), he is only required to show that his proposed accommodation is reasonable "on its face, <u>i.e.,</u> ordinarily or in the run of cases," after which Clairson "must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances," <u>id.</u> at 401-02, and that the district court required him to show more than this. We have previously held that "the ADA does not require [the employer] to eliminate an essential function of [the plaintiff's] job." <u>Davis</u>, 205 F.3d at 1305. In other words, an accommodation that does not enable the employee to perform an essential function of his position is facially unreasonable and is not required by the ADA. <u>Barnett</u> did nothing to alter this rule. Indeed, the Supreme Court in <u>Barnett</u> cited approvingly <u>Reed v. LePage Bakeries, Inc.</u>, 244 F.3d 254 (1st Cir. 2001), which held that "[i]n order to prove 'reasonable accommodation,' a plaintiff needs to show not only that <u>the proposed accommodation would enable her to perform the essential functions of her job</u>, but also that, at least on the face of things, it is feasible for the employer under the circumstances." <u>Id.</u> at 259 (emphasis added); <u>see also</u> <u>D'Angelo</u>, 422 F.3d at 1229 (affirming the <u>Davis</u> rule in a post-<u>Barnett</u> case). In this case, the district court concluded that Holly's proposed accommodation would indeed <u>not</u> enable him to perform the essential functions of his job. Although the genuine issues of material fact regarding whether strict punctuality is an essential function of Holly's position made the court's award of summary judgment to Clairson improper, the district court did not err in holding that an ADA plaintiff in a failure-to-accommodate claim bears the initial burden of showing that his proposed accommodation would enable him to perform the essential functions of his job. And because the district court held that Holly had not met this initial burden, there was no reason for the court to have required Clairson to show undue hardship under the circumstances.

33

posing an undue hardship on the employer. Allowing uniformly-applied, disability-neutral policies to trump the ADA requirement of reasonable accommodations would utterly eviscerate that ADA requirement. As the Supreme Court has explained:

> [P]references will sometimes prove necessary to achieve the Act's basic equal opportunity goal. The Act requires preferences in the form of "reasonable accommodations" that are needed for those with disabilities to obtain the same workplace opportunities that those without disabilities automatically enjoy. By definition any special "accommodation" requires the employer to treat an employee with a disability differently, i.e., preferentially. And the fact that the difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach.
>
> Were that not so, the "reasonable accommodation" provision could not accomplish its intended objective. . . . Neutral "break-from-work" rules[, for instance,] would automatically prevent the accommodation of an individual who needs additional breaks from work, perhaps to permit medical visits.

US Airways, Inc. v. Barnett, 535 U.S. 391, 397-98 (2002); see also Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 647-48 (1st Cir. 2000) (reversing district court's holding that accommodating plaintiff by permitting her medical leave beyond that allowed under the company's own policy is per se unreasonable, and requiring an "individualized assessment" of plaintiff's need); EEOC Enforcement Guidance, Question 17 ("If an employee with a disability needs additional unpaid leave as a reasonable accommodation, the employer must modify its 'no-fault'

34

leave policy to provide the employee with the additional leave, unless it can show that: (1) there is another effective accommodation that would enable the person to perform the essential functions of his/her position, or (2) granting additional leave would cause an undue hardship.  Modifying workplace policies, including leave policies, is a form of reasonable accommodation."); id., Question 22 ("An employer must provide a modified or part-time schedule when required as a reasonable accommodation, absent undue hardship, even if it does not provide such schedules for other employees." (emphasis added)).

In sum, the fact that Holly's non-disabled co-workers were equally subjected to Clairson's punctuality policy is not relevant to the question whether Clairson discriminated against Holly by failing to reasonably accommodate his disability, and it was error for the district court to hold otherwise.[17]

---

[17] This interpretation of the "subjected to unlawful discrimination because of his disability" prong of the plaintiff's prima facie case in the context of a failure-to-accommodate claim does not render it void of content.  In addition to requiring the plaintiff to show that he was "unlawfully discriminated against" -- that is, that his employer failed to reasonably accommodate his disability, leading to an adverse employment decision -- the plaintiff must show that this discrimination occurred "because of his disability" -- that is, that the adverse employment decision was caused by his disability.  In this case, for instance, Holly bears the burden of showing not only that Clairson failed to reasonably accommodate his disability, but that, but for Clairson's failure to accommodate his disability, he would not have been terminated -- in other words, Holly must show that his disability caused him to be late, so that Clairson's failure to give him any leeway in its punctuality policy, leading to his termination, amounted to termination "because of his disability."

## III. Conclusion

Because there plainly are genuine issues of material fact concerning whether Holly is a qualified individual within the meaning of the ADA, the entry of summary judgment for Clairson on this issue was improper. Moreover, it was error for the district court to grant summary judgment for Clairson on the alternative ground that Holly failed to provide evidence of disparate treatment. We therefore reverse and remand to the district court for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**