[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-11226
Non-Argument Calendar

_____

D.C. Docket No. 8:15-cv-02727-MSS-MAP

DOROTHY E. WINNIE,

Plaintiff-Appellant,

versus

INFECTIOUS DISEASE ASSOCIATES, P.A.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(November 8, 2018)

Before MARCUS, ROSENBAUM and HULL, Circuit Judges.

PER CURIAM:

Dorothy Winnie appeals the grant of summary judgment in favor of her former employer, Infectious Disease Associates ("IDA"), in her employment discrimination lawsuit alleging claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a), and for promissory estoppel under Florida law. After review, we affirm.

## I.  FACTUAL BACKGROUND

Because Winnie sued for disability and age discrimination, we must detail her job duties, her surgery, and the restrictions after surgery.

### A.    IV Nurses

The employer, IDA, has a highly specialized medical practice where doctors and nurses diagnose and treat patients with life-threatening infections.  IDA's patients are typically quite ill, have failed oral antibiotics, and come for a regimen of intravenous ("IV") infusions of highly potent antibiotics.  Open every day of the year, IDA hires only highly trained IV nurses because they must administer extremely potent drugs using special needles that are inserted and removed daily. IDA's IV room does not have any other employees except for trained IV nurses.

Staffing the IV room with highly skilled IV nurses is a complex process and requires nurses who are flexible to work when needed.  The IV room is staffed with four IV nurses on weekdays and two on weekends and holidays.  IV nurses

2

are frequently required to reach, bend, twist, pull, and push to attend to the IV patients.  IV nurses must be precise to insert butterfly needles into patients' veins. A mistake in administering the extremely potent drugs can result in serious injury or death.

The job duties of an IV nurse require lifting more than five pounds, reaching overhead, and using both hands and arms.  For example, IV nurses must use both arms and hands to: (1) remove and reapply compression stockings and wound dressings; (2) wrap tourniquets around patients' arms while applying pressure; (3) insert and remove butterfly needles into patients' arms for a blood draw or infusion; (4) hold and mix syringes with medication; (5) hold infusion bags and coordinate them with antibiotic vials; (6) tear alcohol swabs and other packets; (7) screw needles onto syringes; (8) assist patients in and out of wheelchairs and recliners; (9) help patients who are unsteady on their feet; and  (10) carry IV bags and boxes of medications and place them on shelves.  Every IV nurse must be able to perform all of the job duties.

Randi Lewis, an IV nurse, explained that IV nurses must use both of their arms and hands to perform their job.  Although the nurses try to work as a team, they all must be able to perform all of the job duties.

## B.    Winnie's Employment

3

Beginning in January 2003, Plaintiff Winnie worked as an IV nurse for IDA. When hired, Winnie was 58 years old. From 2003 until 2013, Winnie worked 40 hours or more per week, including certain weekends. In 2013, when Winnie was 68 years old, IDA granted Winnie's request for a reduced work schedule of 32 hours per week. Although it did not have an available 32-hour per week position, IDA allowed Winnie to work that reduced schedule and retain employee benefits.

## C.    Winnie's February 2014 Leave Request and Surgery

On February 7, 2014, Winnie went to a doctor who scheduled her to have rotator cuff surgery on her left shoulder on February 18. Winnie had not discussed the matter with IDA. Before having rotator cuff surgery, Winnie's shoulder did not prevent her from performing her job as an IV nurse, and she had no limitations that impacted her daily life, other than occasional discomfort when sleeping. Prior to February 2014, Winnie never told IDA she had a history of a medical impairment or disability and never requested any accommodation.

On or about February 7, 2014, Winnie advised her supervisor, Susan Padalik, that she requested a leave of absence to have rotator cuff surgery on February 18, 2014. Winnie told Padalik that if the leave of absence was a problem, she would cancel the surgery because she needed her job. Padalik responded that she would talk to Lori Brand, IDA's manager and practice administrator, but Padalik was sure the leave of absence would not be a problem. A few days later,

4

Padalik told Winnie that Brand concluded Winnie's leave of absence would not be a problem.  Notably, Brand was under the impression that Winnie needed only eight weeks of leave, stating in an e-mail sent the day before Winnie's surgery that Winnie "will be off for the next 8 weeks."

Before her surgery, Winnie's doctor provided her with a detailed list of restrictions after surgery, which Winnie did not provide to IDA.  The restrictions included wearing a shoulder immobilizer with no use of the upper extremity besides elbow, wrist, and hand exercises for the first two months after surgery. From two to four months after surgery, Winnie could remove the immobilizer but could not lift anything heavier than five pounds, use her left arm overhead, or do anything athletic or strenuous.  Winnie had the surgery on February 18, 2014.

Winnie did not request any accommodation other than a leave of absence. Winnie never specifically discussed with anyone that she would need four months of leave, and no one told her she could take four months of leave.  Winnie admitted that providing her with a leave of absence for four months from February to June 2014 would create a hardship on IDA.  Winnie even admitted that IDA never promised to hold her position open and was not obligated to do so.

## D.    Employee Handbook

Back in 2003 at her hire, Winnie received an employee handbook containing IDA's policies, including a leave of absence policy.  Winnie did not review that

5

policy before requesting leave on February 7, 2014.  That leave of absence policy: (1) required at least a 30-day advance written notice of leave; (2) permitted an unpaid leave of absence not to exceed 12 weeks, provided that it was not detrimental to the office's operation; and (3) explained that an employee who does not return after 12 weeks may be terminated.  Winnie did not give at least 30 days advance written notice prior to her requested leave.

### E.    Winnie's March 2014 Release to Work and Denial to Return

On March 20, 2014, Winnie's doctor released her to return to work with restrictions, including "no use of [her] upper extremity," meaning that she would not be able to use her left arm.  Winnie had not provided her doctor with a list of her job duties as an IV nurse.

In response, on March 21, 2014, IDA's doctor, Dr. Andrew Krinsky, wrote a letter, stating that there was no light duty work in the IV room, as Winnie's job required using both hands and arms to insert and manipulate needles and IV tubing and to mix medications.  Dr. Krinsky stated that Winnie could not return to work until she could use both arms and hands, and that IDA looked forward to having Winnie return when she was able to do her job.  Winnie agreed with Dr. Krinsky's letter, and that there was no light duty work at IDA.

### F.    Winnie's April 2014 Redetermination

6

On April 2, 2014, Winnie provided her doctor with a written list of her job duties.  On April 4, 2014, Winnie's doctor reversed his prior determination and indicated that Winnie was no longer released to return to work.  Winnie's doctor advised that she would not be released to work until June 9, 2014, which meant that Winnie's total leave would be 16 weeks.

As of April 2014, Winnie remained under restrictions that prevented her working as an IV nurse, including restrictions on lifting any weight with her left arm for two additional months.  IDA provided Winnie with two months' paid leave from February 18, 2014, through April 17, 2014, even though IDA's IV program was exceptionally busy during this period, as IDA's patient census was at an all-time high.

Winnie admitted that her ability to live her life was not impaired by the shoulder surgery.  She testified that, even during the recovery period, she could conduct all major life activities other than lifting with her left arm.  Winnie stipulated that the restrictions following her surgery were temporary in nature.  Winnie testified that she could have done her job with only her one uninjured arm, but also admitted that IV nurses were required to use both of their arms and hands, lift over five pounds, and move their arms over their head.  Winnie also testified that, after surgery, she could have done many other types of jobs.

7

In an expert report, Dr. Anthony S. Albert, an orthopedic surgeon, stated that there were many IV nurse tasks that Winnie would have been unable to complete for at least four to five months after surgery. However, there were many jobs that Winnie could have performed prior to being released on full duty, including other types of nursing jobs. Although she had activity restrictions following her surgery, she was not substantially limited in any major life activity.

Another IV nurse at IDA, Gwen Levanti, testified that someone with one arm could perform the job of an IV nurse as part of a group, although it would be difficult if they were alone. However, Levanti admitted that: (1) many job duties required, or were made easier by, using both hands; (2) other IV nurses had received help completing job duties when they returned from medical leave; and (3) she did not know whether these nurses had been released to work by their doctors.

## G.    Winnie's Termination

On April 17, 2014, Brand told Winnie that due to IDA's high patient census and urgent staffing needs, IDA needed to hire a full-time IV nurse and was eliminating her part-time, 32-hour position, and she was being terminated. Winnie was 69 years old at the time of her termination. In April 2014, IDA hired a full-time IV nurse.

8

Levanti testified that, while Winnie was on leave, IDA hired Corbin Butler as an IV nurse. Levanti guessed that he was between 30 and 40 years old, but this was a "complete guess."[1] Levanti did not know if there had been any part-time IV nurses since Winnie's leave in 2014.

At the time of Winnie's termination, in April 2014, Winnie had not been released to work, and per her doctor, she was unable to work for two additional months until June 2014. Winnie remained under restrictions in May and June 2014 that prevented her from performing her job. Winnie had not been released to work within three months after her surgery.

Brand stated that IDA's patient census was at an all-time high during Winnie's leave. The patient census showed that IDA had 1,302 patients in February 2014, compared to 926 in February 2013. IDA also had 1,328 patients in March 2014, compared to 740 in March 2013. Finally, IDA had 1,063 patients in April 2014, compared to 778 in April 2013.

Brand stated that IDA was understaffed because Winnie was on leave and two as-needed nurses were unavailable and, while Winnie was on leave, some of the IV nurses worked 14 straight days and were exhausted and overworked. This staffing shortage disrupted IDA's operations, and continuing to operate short-staffed would endanger patient safety. Also, IDA's patients would have

---

[1]Ultimately, IDA fired Butler. After Butler left, IDA hired Abigail Demler, who was also probably between 30 and 40 years old.

faced a significant risk of substantial harm to their health and safety if Winnie had been permitted to work as an IV nurse while under restrictions that prevented her from using both arms and hands. Based on Brand's experience in recruiting, hiring, and staffing the IV room at IDA, she was confident she would not have been able to find a qualified IV nurse with the requisite skills and experience to safely treat IDA's patients who was also willing to work as a temporary fill-in for Winnie.

Winnie testified that she did not doubt Brand's stated reason for her termination.

## H.    Remarks about Age

Winnie claimed that IDA believed that older employees needed more training in new technology, and that certain employees made comments about her older age. Specifically, Winnie testified that Holly Garrett Roberts, IDA's manager of training for electronic records, told Winnie to "give it up. Don't even bother" when learning the new electronic medical records system. Levanti similarly testified that, when the electronic medical records system was first introduced, comments were made about older nurses not being as computer-literate as younger ones. Winnie also testified that another nurse, Linda Welch, told her that "older nurses need[ed] to be careful because they [were] not going to be around" due to the difficulty in explaining the computer to them. Winnie admitted

that neither Roberts nor Welch were her supervisor or members of management at IDA, and both made these comments in 2013 or earlier.

Winnie also testified that Padalik told her to "[b]e careful talking about [her] age," but that she did not know whether Padalik had any input into her termination decision. Brand stated that she alone made the decision to terminate Winnie, that Winnie's age had nothing to do with her termination, and that she was not aware of any comments made to Winnie regarding her age.

## I.    Winnie's June 2014 Release to Work

After her termination, Winnie's doctor finally released her to work without restrictions on June 16, 2014. Winnie then sent an e-mail to Brand requesting full-time employment if IDA had any positions, but stating she would also accept per diem work or whatever shifts were available. Winnie sent a similar e-mail to Padalik on June 20, 2014.

## II.  PROCEDURAL HISTORY

Winnie filed this action in district court, alleging that her termination was (1) a discriminatory discharge under the ADA based on her rotator cuff surgery, and (2) a discriminatory discharge under the ADEA because she was 69 years old. Winnie also alleged a promissory estoppel claim under Florida law based on IDA's employee handbook and subsequent statement that her leave of absence would not be a problem.

The district court granted IDA's motion for summary judgment on all claims.  Winnie timely appealed.[2]

### III.  ADA TERMINATION CLAIM

The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  To prove a prima facie case of wrongful termination based on a disability under the ADA, an employee must show: (1) a disability; (2) that she was otherwise qualified to perform the essential functions of the job; and (3) the employer discriminated against and terminated her based on her disability.  Williams v. Motorola, Inc., 303 F.3d 1284, 1290 (11th Cir. 2002).[3]

After an employee establishes a prima facie case, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for her termination.  Raytheon Co. v. Hernandez, 540 U.S. 44, 49 n.3, 124 S. Ct. 513, 517 n.3 (2003).  If the employer meets this burden, the employee can prove discrimination by

---

[2]We review a grant of summary judgment de novo, construing the facts and drawing all reasonable inferences in favor of the nonmoving party.  Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1255 (11th Cir. 2007).  Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We will give credence to evidence favoring the non-movant, as well as uncontradicted and unimpeached evidence from disinterested witnesses that supports the moving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151, 120 S. Ct. 2097, 2110 (2000).

[3]On appeal, Winnie argues that she raised an independent failure-to-accommodate claim under the ADA, but she did not raise such a claim in her second amended complaint.  Although Winnie made passing references to an accommodation in her complaint, her ADA claim is premised on a discriminatory termination.

12

offering evidence demonstrating that the employer's reason was pretextual. Id. To demonstrate pretext, an employee must show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons that a reasonable factfinder could find them unworthy of credence. Rioux v. City of Atlanta, 520 F.3d 1269, 1275 (11th Cir. 2008).

## A.    Disability

An individual is disabled if she has: (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such an impairment; or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(1). The definition of disability should be construed in favor of broad coverage.[4] Id. § 12102(4)(A). Major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. Id. § 12102(2). An impairment need only limit one of these activities to qualify as a disability. Id. § 12102(4)(C). An impairment that lasts fewer than six months can be substantially limiting. 29 C.F.R. § 1630.2(j)(1)(ix).

---

[4]Winnie argues that the district court applied a more demanding standard in analyzing the phrase "substantially limits." Contrary to Winnie's argument, the district court recognized that the phrase "substantially limits" is to be construed broadly, not strictly.

Here, the district court concluded that Winnie failed to establish a prima facie case that (1) she was disabled and (2) if she was disabled, that she was a qualified individual for her IV nurse job. As to the district court's disability determination, the defendant IDA points out that: (1) Winnie admitted that she did not have a record of disability and that her employer did not regard her as having a disability; (2) Winnie never showed that one or more of her major life activities was substantially impaired; (3) Winnie testified that, even during her recovery period, she could conduct all major life activities other than lifting with her left arm; and (4) Winnie stipulated that the restrictions following her surgery were temporary in nature, and admitted that her ability to live her life was not impaired by her shoulder surgery.

Although a temporary impairment to even one major life activity, such as lifting, can be enough to establish a disability, the defendant IDA emphasizes that Winnie did not show that her ability to lift was substantially impaired because: (1) she could still lift with her right arm without any impairment; and (2) the lifting restriction on her left arm was only for four months and she was cleared to return to her nurse position without restrictions in June 2014. See 42 U.S.C. § 12102(4)(C); 29 C.F.R. § 1630.2(j)(1)(ix).

14

We need not decide this disability issue because Winnie, in any event, was not a qualified individual under the ADA and failed to show pretext.[5]

## B.    Qualified Individual

Even if Winnie was disabled, her ADA termination claim still fails because she did not show that she was a qualified individual.  Specifically, following surgery, Winnie was unable to complete her essential job functions as an IV nurse, with or without a reasonable accommodation.  42 U.S.C. § 12111(8).

The ADA defines "qualified individual with a disability" as an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position.  Id.  The plaintiff must show either that she can perform the essential functions of the job without accommodation or, failing that, that she can perform the essential functions of the job with an accommodation.  Holly v. Clairson Indus., LLC, 492 F.3d 1247, 1256 (11th Cir. 2007).  The accommodation must enable the plaintiff to perform the essential functions of her job.  29 C.F.R. § 1630.2(o)(1)(ii).  If the plaintiff is unable to perform an essential function of her job, even with an accommodation, she is not a qualified individual covered under the ADA.  Davis v. Fla. Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000).

---

[5]As to Winnie's new argument on appeal that she was substantially limited in the major life activity of working, she did not raise this before the district court.  To the extent Winnie also argues that the district court improperly relied on Dr. Albert's report, the district court mentioned the report once only briefly in its summary judgment order, and the report is consistent with the rest of the evidence in the record.

Here, Winnie's doctor had not released her to return to work as an IV nurse in April 2014, and, therefore, Winnie could not perform her duties without an accommodation. We recognize Winnie stated that she believed she could have done her job using only her one uninjured arm, but the record does not support her contention. Winnie admitted that IV nurses were required to use both of their arms and hands, lift over five pounds, and move their arms over their head, and stipulated that every IV nurse needed to be able to perform all job duties. Likewise, Levanti testified that someone using only one arm could perform the duties of an IV nurse as part of a group, but would have difficulty doing so alone, and that many job duties required, or were made easier by, using both hands. Lewis also stated that IV nurses must use both of their arms and hands to perform the job duties, and that, although the nurses try to work as a team, they all must be able to perform all of the job duties of an IV nurse. Additionally, Brand stated that IDA's patients would have been at risk if Winnie came back to work using only her one uninjured arm.

So the qualified-individual issue becomes whether Winnie showed that a reasonable accommodation existed that would have allowed her to complete the essential functions of her job. Holly, 492 F.3d at 1256. The only accommodation Winnie identified was a leave of absence for four months.

16

Even if the employee shows that she can perform the essential functions of the job with an accommodation, the employer may present evidence that the employee's requested accommodation imposes an undue hardship. Holbrook v. City of Alpharetta, 112 F.3d 1522, 1526 (11th Cir. 1997). "Undue hardship" means an action requiring significant difficulty or expense. 42 U.S.C. § 12111(10)(A). In determining whether an accommodation would impose an undue hardship, some factors to consider are the nature and cost of the accommodation and the type of operation of the employer, including the composition, structure, and functions of the workforce. Id. § 12111(10)(B).

In this particular case, even assuming the four-month leave would have been a reasonable accommodation under normal conditions, IDA established that providing a four-month leave to Winnie would have been an undue hardship under the circumstances, given the type of work IDA did and the composition and function of its IV nurses. See Holbrook, 112 F.3d at 1526; 42 U.S.C. § 12111(10)(B). The parties stipulated that IDA, a specialized medical practice, hired only highly trained IV nurses because the job required them to administer extremely potent drugs using special needles. Importantly, Brand stated, and the record shows, that the patient census was at an all-time high, and that IDA was understaffed with Winnie on leave and two as-needed nurses unavailable. Indeed, Winnie even testified that providing her with a leave of absence through June 2014

17

would have created a hardship on IDA, and that IDA was not obligated to hold her position open for four months. Given the serious nature of IDA's business and its exceptionally high number of patients and limited staff, the record shows that allowing Winnie to take a four-month leave of absence would have constituted an undue hardship for IDA.

## C.    Pretext

Alternatively, even if Winnie established a prima facie case of wrongful termination under the ADA, summary judgment was still proper because she did not establish that IDA's legitimate, nondiscriminatory reason for her termination was pretextual. IDA's stated reason for terminating Winnie was that, because the patient census was high and the IV room was understaffed, it needed a new full-time IV nurse. At the time of Winnie's leave, the record shows that the patient census was at an all-time high and IDA lacked flexibility in staffing because Winnie and two as-needed nurses were unavailable. And based on her experience, Brand was confident she would have been unable to find a qualified IV nurse to work as a temporary fill-in for Winnie. Winnie presented no evidence that drew Brand's reason for her termination into question. See Rioux, 520 F.3d at 1275. In fact, Winnie testified that she did not doubt Brand's stated reason for her termination.

As to Winnie's argument that Brand's reason was pretextual because Brand did not grant her a four-month leave of absence and did not reinstate her after she recovered, Winnie testified that she never had conversations with anyone about needing four months of leave and that IDA was not obligated to hold her position open for those four months.

## IV.  ADEA TERMINATION CLAIM

As to Winnie's age discrimination claim, under the ADEA, it is unlawful for an employer to discharge an employee who is at least 40 years of age because of that employee's age.  29 U.S.C. §§ 623(a)(1), 631(a).  To establish an ADEA claim, a plaintiff must show through either direct or circumstantial evidence that age was the "but-for" cause of her termination.  Mora v. Jackson Mem'l Found., Inc., 597 F.3d 1201, 1204 (11th Cir. 2010).

Here, Winnie has provided no direct evidence of age discrimination, and, therefore, she relies only on circumstantial evidence to establish her claim.  An age discrimination claim premised on circumstantial evidence is subject to the burden-shifting framework under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).  Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304, 1308 (11th Cir. 2012).  To show a prima facie case of age discrimination, the plaintiff must show that: (1) she was a member of the protected age group; (2) she was subject to an adverse employment action; (3) a substantially younger person

filled the position from which she was discharged; and (4) she was qualified for the position in question.  Id.

  If a plaintiff establishes a prima facie case of age discrimination, the employer must then articulate a legitimate, nondiscriminatory reason for the challenged employment action.  Id.  If the employer articulates at least one reason, then the plaintiff has the opportunity to demonstrate that the employer's stated reason was pretext for discrimination.  Id.

## A.    Winnie's Prima Facie Case

Here, Winnie worked as an IV nurse at IDA for 11 years, and she was 69 years old when IDA terminated her.  IDA replaced Winnie with Butler, whom Levanti guessed was between 30 and 40 years old.  See id.  We assume for purposes of this appeal that Winnie established a prima facie case of age discrimination.[6]

## B.    Pretext

Even assuming Winnie established a prima facie case, summary judgment was nonetheless appropriate because she did not demonstrate that IDA's legitimate, nondiscriminatory reason for her termination was pretextual.  IDA's

---

[6]IDA argues Winnie failed to show Butler's exact age, and, thus, did not establish that she was replaced by a younger person.  This testimony at a minimum was sufficient to create a jury issue as to Butler's age and was sufficient to show Butler was at least younger than Winnie, age 69.

stated reason for terminating Winnie was that, because the patient census was high and the IV room was understaffed, it needed a new full-time IV nurse.

Although Winnie identified ageist statements made by her coworkers, none of those coworkers were involved in the decision to terminate her.  See Steger v. Gen. Elec. Co., 318 F.3d 1066, 1079 (11th Cir. 2003) (explaining that a decisionmaker's discriminatory comment may constitute circumstantial evidence that could assist a jury in disbelieving the employer's proffered reasons for the adverse action, but statements by non-decisionmakers do not satisfy the employee's burden).  Brand alone made the decision to terminate Winnie, which she said was not based on Winnie's age, and Brand was not aware of any comments made to Winnie regarding her age.  Further, Winnie admitted that she did not doubt Brand's stated reason for terminating her.[7]

## V.  FLORIDA PROMISSORY ESTOPPEL CLAIM

Generally, promissory estoppel is the principle that a promise made without consideration may nonetheless be enforced to prevent injustice if the promisor reasonably should have expected the promisee to rely on the promise and if the promisee did actually rely on the promise to her detriment.  DK Arena, Inc., v. EB Acquisitions I, LLC, 112 So. 3d 85, 93 (Fla. 2013).  The promisor is only bound by

[7]IDA contends that Winnie's part-time position was eliminated, and, thus, this alone defeats Winnie's claims.  Winnie counters that the evidence creates a jury issue as to whether her position was eliminated.  We need not decide that issue because even if her position was not eliminated, Winnie did not establish that IDA's legitimate reason for terminating her was pretext.

21

reliance that she does or should foresee.  Leonardi v. City of Hollywood, 715 So.

2d 1007, 1009 (Fla. Dist. Ct. App. 1998).  Factors to consider in this determination

include the reasonableness of the promisee's reliance and the definite and

substantial character of the promise.  Id.  Promissory estoppel does not apply if the

terms of the promise are indefinite.  Vencor Hosps. v. Blue Cross Blue Shield of

Rhode Island, 284 F.3d 1174, 1185 (11th Cir. 2002).

Here, the district court properly granted summary judgment to IDA on

Winnie's promissory estoppel claim for several reasons.[8]  First, Winnie failed to

demonstrate that the terms of the purported promise—that her leave would not be a

problem—were definite enough to constitute an enforceable promise of

reinstatement.  Id.  Winnie testified that she never specifically discussed with

anyone at IDA that she would need four months of leave, no one told her she could

take four months of leave, and no one promised to hold her position open.  Based

on an e-mail sent the day before Winnie's surgery, Brand believed Winnie needed

only eight weeks of leave.

Second, Winnie could not have reasonably relied on Padalik's statement—

that her leave would not be a problem—because it contradicted IDA's written

_____

[8]Winnie argues that the district court denied IDA's motion to dismiss her promissory estoppel claim, but then granted its motion for summary judgment on this claim without explaining the change.  The district court explained its reasons for granting summary judgment on this claim, and, in any event, the legal standards for these motions are different.  See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007); Fed. R. Civ. P. 56(a).

employee handbook, and Winnie never discussed the exact length of her leave with anyone. IDA's leave of absence policy indicated that, although IDA would attempt to provide employees with leaves of absence, a leave of absence could only last 12 weeks and could not be detrimental to the operation of the office. The policy also stated that IDA was under no obligation to hold a position open, employees were required to give a 30-day advance notice of any leave, and an employee who did not return after 12 weeks may be subject to termination.

Winnie's leave of absence did not comply with IDA's written policy because: (1) she needed four months of leave, not three; (2) her absence was detrimental to the operation of the office due to the high patient census and urgent staffing needs; and (3) she did not give a 30-day advance notice. Winnie admitted she had received the employee handbook when she was hired, but she had not reviewed it before asking for a leave of absence.

In light of IDA's written policy, Winnie's reliance on Padalik's statement was not reasonable where Winnie never specifically discussed with anyone the exact length of her leave or that she would need four months of leave, and no one told her she could take four months of leave.[9]

---

[9]Winnie also alleged disability and age discrimination claims under the Florida Civil Rights Act of 1992 and retaliation claims under federal and state law. However, she does not raise these claims on appeal, and, therefore, we do not address them.

## VI.  CONCLUSION

For the foregoing reasons, we affirm the district court's grant of IDA's motion for summary judgment on all of Winnie's claims.

**AFFIRMED.**