[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-11291

Non-Argument Calendar

_____

TIPTON D. SHOLES,
M.D.,

Plaintiff-Appellant,

*versus*

ANESTHESIA DEPARTMENT, et al.,

Defendants,

BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA,
d.b.a. Augusta University,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 1:19-cv-00022-JRH-BKE

_____

Before WILLIAM PRYOR, Chief Judge, and WILSON and LUCK, Circuit Judges.

PER CURIAM:

Tipton Sholes, M.D., a former resident anesthesiologist, appeals the summary judgment in favor of the Board of Regents of the University System of Georgia and its Augusta University and against his complaint of disability discrimination in violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. The district court ruled that although Sholes had a disability of narcolepsy, he failed to establish that he was a "qualified individual" under the Act and that the Board did not fail to accommodate his disability because his request to be transferred to a different program without engaging in the application process was untimely and unreasonable. We affirm.

## I. BACKGROUND

On July 1, 2016, Sholes began his residency in the Augusta University Anesthesiology and Perioperative Medicine

Department. The anesthesiology program ordinarily requires three years to complete, and the American Board of Anesthesiology and an accreditation council oversee various aspects of the program, which consists of a defined academic schedule and work in the operating room. If a resident fails to attend at least 80 percent of the educational component, he receives an "unsatisfactory" evaluation in the core competency of professionalism, which is reported to the Anesthesiology Board. Residents are required to arrive at work no later than 6:30 a.m. and have their operating room set up and patient interviews completed by 7:00 a.m. Residents receive evaluations from faculty, providers, and senior residents, and these evaluations are provided to the Clinical Competency Committee. Every six months, the Committee evaluates each resident's progress and shares its evaluation with the Anesthesiology Board. Any resident who receives an "unsatisfactory" report is placed on remediation, and two consecutive unsatisfactory reports require a residency extension of at least six months.

Within Sholes's first three weeks of residency, the director of the anesthesiology program, Dr. Mary Arthur, and the chief resident met with Sholes after receiving complaints from faculty and senior residents about him arriving to work and coming back from breaks late, missing lectures, being unable to be in a room by himself, using his phone during a case, and failing to have his rooms and instruments ready before a case, which suggested he was unable to run anesthetic procedures safely at the level of his peers. On November 22, 2016, after Dr. Arthur continued receiving complaints about Sholes repeatedly arriving late to work and patient

safety concerns, she met with him again and implemented a plan for him to complete daily time logs. When Sholes mentioned that he had trouble waking up and hearing his pager, she suggested that he reach out to his primary care physician and consider an alarm clock with blinking lights. After this meeting, Dr. Arthur continued to receive complaints about Sholes.

After several months, the Committee issued Sholes an overall clinical competency grade of unsatisfactory. His deficiencies were "continued tardiness," "lack of engagement" that "impact[ed] his peers and faculty alike," and "lack of situational awareness, preparedness and an unwillingness to follow directions[, which] is an ongoing problem." His performance was marked unsatisfactory in the following areas: "Demonstrates honesty, integrity, reliability, and responsibility," "Learns from experience; knows limits," and "Reacts to stressful situations in an appropriate manner." In January 2017, Sholes took the Anesthesiology Knowledge Test and scored below 99 percent of test-takers.

In March 2017, the Committee held an emergency meeting and placed Sholes on a 90-day remediation plan to address the ongoing complaints. Under the plan, faculty members were to evaluate Sholes daily and closely supervise him in the operating room, and Sholes was to meet with his mentor weekly. The plan warned Sholes that "another serious complaint" by a department member or patient "shall constitute possible grounds for dismissal," and insufficient improvement at the end of the plan would result in "formal disciplinary action," including non-renewal of his contract.

The plan also required an evaluation of his fitness for duty, but the physician found no issues. After Sholes's wife learned about the re-mediation plan, she scheduled additional medical evaluations.

In April 2017, Dr. Vaughn McCall diagnosed Sholes with narcolepsy without cataplexy. On May 5, 2017, Sholes and his wife met with Dr. Arthur along with the anesthesiology department chairman, Dr. Steffen Meiler, and Assistant Dean of the Medical College, Dr. Walter Moore, about the diagnosis. After the meeting, Sholes was placed on a 90-day medical leave of absence to regulate his medications.

On July 17, 2017, Sholes informed Dr. Meiler and Dr. Arthur that Dr. McCall had cleared him to return to work with no re-strictions effective August 1. But after Dr. Arthur contacted Dr. McCall with Sholes's permission, Dr. McCall stated that he never cleared Sholes to return to work. Dr. McCall forwarded Dr. Meiler an e-mail in which Dr. McCall had asked a prominent sleep physician "whether a treated narcoleptic can be trusted to safely execute medical procedures when up all-night." The physi-cian responded that he was "not sure if there is a way to fully ensure safety." As a result, Dr. McCall believed that he could not clear Sholes to take night calls or say with a reasonable degree of cer-tainty whether Sholes would be able to function as an anesthesiol-ogist during night calls without endangering his patients. The de-partment held several meetings regarding Sholes's diagnosis and the legal risk it posed to both Sholes and the department. Although the department planned to tell Sholes that his contract would not

be renewed due to patient safety and liability concerns, the university's employment equity director, Glenn Powell, and in-house counsel advised them to wait to discuss possible accommodations.

On August 28, 2017, Dr. Arthur informed Sholes by e-mail that the program would "provide reasonable accommodations that will enable [him] to perform [his] essential work functions" and advised him to meet with Powell to discuss the accommodation process. Sholes testified that he met with Powell but "never really asked for any accommodations" or filed any formal accommodation requests but instead told Powell that his condition was "accommodated with medicine." Powell testified that he did not recall Sholes requesting an accommodation. After Powell requested a list of essential functions of a resident anesthesiologist, Dr. Arthur compiled a list including daily responsibilities such as arriving at the hospital no later than 6:30 a.m. each day and continuous on-site duty and in-house call up to 24 hours.

On September 1, 2017, Sholes returned from medical leave. According to the department, Sholes still was required to successfully complete the remediation plan upon his return, and Sholes was not permitted to work certain rotations or night call. Over the next three months, Dr. Arthur received reports that Sholes was late or out sick at least 16 times, often waiting until several hours after his shift to notify anyone. Due to his unreliability, the department had a contingency plan for when Sholes was scheduled to work. Sholes's evaluations after he returned stated, among other things, that he needed "to be more prepared and on time for his cases [and

that] he does not demonstrate readiness to progress," was "missing the basic concepts of anesthesia," and "has not shown the ability to think critically on his own."

In December 2017, Dr. McCall initially certified that Sholes should be able to perform the list of essential functions of a resident anesthesiologist, but he rescinded that assessment after receiving a summary evaluation report of Sholes's performance since his return from medical leave. The report recorded Sholes's performance issues, listing the 16 dates on which he was reported late or called out sick in the previous three months, and included evaluations from supervising doctors. Except for evaluations by Dr. Maria Bauer and Dr. Travis Hamilton, the evaluations reported that Sholes continued to be late to work, needed to improve his skills and knowledge, and was unreliable and uncommunicative. Several evaluations stated that Sholes left to take a nap and did not wake up on time. Even positive evaluations from Dr. Bauer noted that Sholes had been late before and still "needs the help and attention most of our [first year residents] no longer need." Another doctor remarked that although other residents had some success with Sholes, he found Sholes sleeping in a call room for two and a half hours during a case, and he could not say that Sholes "is capable of improving enough to become a safe anesthesiologist. I hope that doesn't sound too harsh, but I feel it is the truth." The report concluded that Sholes was "[u]nable to consistently show up on time for lectures, grand rounds and the operating room"; "[c]annot be relied on to manage an [operating room] by himself (Room not set up and ready on a consistent basis)"; "[t]akes long breaks for naps";

and "[c]annot be relied on to take call." Dr. McCall explained to Dr. Arthur that his initial assessment about Sholes's capabilities "was lacking pertinent disclosure by Dr. Sholes of how he was performing his daily duties." Dr. Arthur testified that if Dr. McCall had concluded that additional changes to Sholes's medication could have caused Sholes to be timely and vigilant in caring for his patients, she would have considered allowing more time for medication adjustments.

On January 24, 2018, after a meeting with Sholes and his mentor, Dr. Hamilton, Dr. Arthur stated in an e-mail to Powell that she advised Sholes that "it was in his best interest to reconsider a career in anesthesia" and that he had been reassigned to the pre-operative clinic. She also stated that Sholes "was very receptive and we reassured him we will be available to help him transition to a new career path when he makes that decision."

On February 1, 2018, six members of the Committee voted to non-renew Sholes's contract, and one member abstained. Dr. Meiler agreed with the recommendation. Dr. Meiler testified that his decision was based on the numerous complaints and evaluations about Sholes after he returned from medical leave, including his incomplete patient evaluations, inability to create a comprehensive treatment plan, and errors made when completing patients' medical records. Dr. Meiler also testified that when he made the decision, he was unaware of any resident who had received as many complaints regarding his ability to practice anesthesiology. On February 19, 2018, Sholes was informed that the department

would not renew his contract due to his "inability to perform the Essential Duties required of a House Officer/Resident. Specifically lack of dependability and reliability caused by continued tardiness."

On February 27, 2018, Dr. Arthur met with Sholes and Dr. Hamilton. Sholes testified that he told Dr. Arthur that he would be eager to switch to another specialty and that "any program that would consider [him]" would be excellent, and he requested assistance with transferring to internal medicine. Dr. Hamilton attested that Sholes requested assistance with transferring and that he later wrote a letter of recommendation for Sholes. Dr. Arthur testified that although she and Sholes had "a couple of interactions" about how to facilitate a transfer, she understood that Sholes would continue to work in the preoperative clinic until the end of his contract, which would prevent a gap in training, help him improve his skills, and allow him to work on obtaining his letters of recommendation. Regarding a former anesthesiology resident who had transferred into the internal medicine program, Dr. Arthur testified that the former resident actively pursued the transfer by applying and going through the interview process. Dr. Meiler testified that although the department could make a recommendation and support the transfer process, it was entirely up to the other program whether to accept Sholes based on its own selection criteria. Sholes testified that when he followed up with Drs. Meiler, Arthur, and Moore, he was directed to apply through the matching process, and Dr. Moore advised him to meet with the student director of the internal medicine program.

In April 2018, Dr. Arthur e-mailed the medical college office that Sholes failed to show up to work for two weeks. After she reached out to his family, Sholes explained that he thought he had been fired but later admitted that the letter stated that his last day of employment was June 30, 2018. Dr. Arthur e-mailed the office and stated that Sholes had returned to the preoperative clinic and that the "understanding is that, if he is able to do well in the next 2 months, both Dr[.] Hamilton and I would give him a letter of recommendation reflecting his performance in the preoperative clinic." But a week later, Dr. Arthur sent another e-mail explaining that Sholes failed to show up to work two additional days, no one could reach him by phone, and he told her that he had retained counsel. Regarding the transfer, Dr. Arthur believed that Sholes had "dropped the ball" on starting another program based on the "inconsistencies from [him] in showing up in the pre-op clinic" and him failing to reach out to another program director after she encouraged him to gather his application materials.

Sholes filed a complaint against the Board, which moved for summary judgment. The Board argued that the undisputed facts established that Sholes could not perform the essential functions of the job and posed a risk to patient safety. The Board argued that it did not fail to accommodate Sholes's disability because the alleged transfer request was untimely and unreasonable. Sholes opposed the Board's motion and relied on declarations from Dr. Hamilton and Dr. Bauer about his ability to perform the job.

The district court granted the Board summary judgment. The district court ruled that Sholes could not establish that he was an otherwise qualified individual because he could not perform the essential functions of the job consistently and dependably. The district court ruled that Sholes could not establish that the only reason for the adverse action was his diagnosis because of the pattern of negative performance evaluations and reports of patient safety concerns that occurred before and after his diagnosis. The district court also ruled that Sholes could not prove that the Board failed to reasonably accommodate his disability because regardless of whether his transfer request was sufficiently specific, he conceded that he did not ask to be transferred until his contract was not renewed, and there was no evidence that the department could "automatically" transfer Sholes without effort on his part.

## II. STANDARD OF REVIEW

We review the grant of summary judgment *de novo*, drawing all factual inferences in the light most favorable to the nonmoving party. *Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1242–43 (11th Cir. 2001). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III. DISCUSSION

The Rehabilitation Act prohibits discrimination on the basis of disability by recipients of federal financial assistance. 29 U.S.C. § 724; *see Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 507 F.3d 1306, 1310 (11th Cir. 2007). Because of its textual similarities with

Title II of the Americans with Disabilities Act, "the same standards govern claims under both, and we rely on cases construing Title II and section 504 interchangeably." *Ingram v. Kubik*, 30 F.4th 1241, 1256 (11th Cir. 2022) (alteration adopted).

To succeed on his claim, Sholes had to establish "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of his disability." *Id.* at 1256–57 (alteration adopted). To be "otherwise qualified," Sholes must "show either that he can perform the essential functions of his job without accommodation, or, failing that, show that he can perform the essential functions of his job with a reasonable accommodation." *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000). "'Essential functions' are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000). "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential . . . ." 42 U.S.C. § 12111(8); *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1257 (11th Cir. 2007).

The district court did not err in ruling that Sholes failed to establish that he was "otherwise qualified." The evidence established that Sholes could not perform the essential functions of a resident anesthesiologist. After returning from medical leave and receiving several warnings about the importance of being on time

to procedures and lectures, supervising doctors documented that he was late or a no-show, often without any advance notice or arranging for coverage, *16 times* in less than three months. Supervising doctors documented their frustrations and "disappoint[ment]" with Sholes for frequently showing up late, taking unauthorized breaks, and sleeping for several hours during the day when the supervising physician was counting on him to work on his case. Supervising doctors recorded their concerns about patient safety and whether Sholes could be trusted. And other supervising doctors, including the chief resident, reported that they would not be able to rely on him and "will always need a backup plan" when Sholes was on the schedule.

Sholes contends that other residents had performance issues too, but Dr. Meiler testified—and Sholes does not dispute—that he received more complaints than any other resident. Sholes asserts that he was unfairly scrutinized. But his remediation plan, which was implemented before his diagnosis and lasted 90 days, specifically required faculty members to complete daily evaluations and to closely supervise him both to ensure patient safety and to allow the Committee to determine whether to non-renew his contract based on his performance, not his diagnosis.

Sholes also argues that the declarations by Dr. Bauer and Dr. Hamilton establish a genuine issue whether Sholes was qualified. But both doctors conceded that Sholes had issues with tardiness, and Sholes does not dispute that timeliness is an essential function of the job of a resident anesthesiologist. Moreover,

Dr. Hamilton did not state that Sholes was qualified to be an anesthesiologist but instead that he believed Sholes was qualified to be a "resident in internal medicine" because that specialty would "be a better fit for him given the restrictions placed on him due to his narcolepsy." And although Dr. Bauer stated that Sholes was as qualified as any other resident anesthesiologist and that, despite not being his treating physician, she "believe[d] he could have performed better with accommodations," her declaration fails to provide any evidence based on personal knowledge that Sholes could have performed his job duties. In the light of the evidence of Sholes's serious performance deficiencies that were recorded by over a dozen doctors and began during his first month of residency, more than nine months before his diagnosis, these two declarations fail to create a genuine dispute about whether Sholes could perform the essential functions of the job.

Insofar as Sholes argues that the discussions held during his medical leave about the potential legal risks of his diagnosis constitute direct evidence that he was unlawfully discriminated against, we disagree. To establish that he was discriminated against in violation of the Rehabilitation Act, he must prove that the discrimination occurred "solely by reason of [] his disability." 29 U.S.C. § 794(a); *see Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("It is not enough for a plaintiff to demonstrate that an adverse employment action was based *partly* on his disability." (emphasis added)). Sholes was warned in March 2017, before he was diagnosed, that "another serious complaint" by a department member or patient "shall constitute possible grounds for dismissal" and that

insufficient improvement at the end of the remediation period would result in formal disciplinary action, including non-renewal of his contract. After more than three months of leave to regulate his medications and after he insisted that he was ready to return to work without any accommodation besides medication, his performance issues did not abate. The evidence establishes that the decision to not renew Sholes's contract was not based solely on his diagnosis.

Next, Sholes argues that the Board failed to accommodate him by facilitating his transfer into another specialty. He argues that the district court erred in ruling that his request was untimely because he remained in the program for several months after the decision was made, and he insists that he did everything he was required to do to obligate the Board to transfer him.

We disagree. "An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide 'reasonable accommodations' for the disability—unless doing so would impose undue hardship on the employer." *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001). But the "burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of h[is] job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable." *Earl*, 207 F.3d at 1367.

The district court correctly ruled that the department did not fail to accommodate Sholes with a transfer. The undisputed

evidence establishes that although Dr. Arthur offered him support with the transfer process, neither she nor anyone else promised him that the department would or could obtain a transfer for him. Moreover, Sholes failed to present any evidence from which a reasonable jury could find that it was *feasible* for the department to unilaterally transfer him with only a phone call and without him submitting the necessary application materials, interviewing, and being accepted based on the requirements of the other program. *See id.* Sholes failed to identify any instance in which the department transferred a resident to a different specialty without that resident taking responsibility for compiling his application materials and meeting the selection criteria of the other program. Although Sholes argues that the district court failed to consider other potential accommodations, such as additional leave to adjust his medications or daytime naps, these requests either were not made or were unreasonable. Dr. Arthur testified that she would have considered additional leave for medication adjustments if Dr. McCall believed it would make a difference, but neither he nor Sholes requested more leave. And even if Sholes specifically requested an accommodation for daytime naps, Dr. Arthur testified that naps would not have been possible to accommodate because of Sholes's well-documented "inability to [] wake up when he took a nap" and to be alert when things "change on a dime."

## IV. CONCLUSION

We **AFFIRM** the summary judgment in favor of the Board.